Jimmy NEUSCHAFER, Petitioner,

v.

Harol WHITLEY, et al., Respondents.

No. CV–R–85–590–ECR.

United States District Court,
D. Nevada.

March 9, 1987.

1. The Mandate was spread upon the records of

N. Patrick Flanagan, III, Asst. Federal Public Defender, Reno, Nev., for petitioner.

Brian McKay, Atty. Gen., Carson City, Nev., for respondents.

## ORDER

EDWARD C. REED, Jr., Chief Judge.

By its order filed January 6, 1987,[1] 807 F.2d 839, the Ninth Circuit Court of Appeals has remanded this case to this Court to hold an evidentiary hearing and to make written findings and a ruling as to whether:

(a) Petitioner initiated the second interview with law enforcement authorities, which resulted in Petitioner's confession of August 21, 1981, which was admitted in evidence at his trial; and

(b) The standards of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) were met, i.e., did Petitioner knowingly and intelligently waive his right to counsel.

An evidentiary hearing was held before the Court on February 18, 1987. Prior to the evidentiary hearing a prehearing status conference was held on February 17, 1987, to settle the prehearing order. At the hearing on February 18, 1987, testimony and documentary evidence were received and the Petitioner was present and testified. The State has met its burden of proof on both of these issues, *see Edwards, supra*, at 485, 101 S.Ct. at 1885, and has satisfied the Court that petitioner initiated the second interview and waived his rights.

## FACTS

The murder for which Petitioner was convicted occurred in the Nevada State Prison on August 18, 1981. The victim's body was found in his cell at approximately 11:00 a.m. that morning. At about 5:45 p.m., Petitioner handed a note to a fellow inmate, Douglas Robinson, with instructions to give it to the authorities. Robinson in turn passed the note on to correctional officer Sonya Turek. This note read: "To Whom It May Concern, I did something bad to Johnnie Johnson this morning so come and get me. Sincerely Jimmy

this Court on January 12, 1987.

Neuschafer." At 8:51 p.m. the same day, inmate Barren handed to Turek a second note from Neuschafer. This note read: "It started by him taking things first. My [illegible].... And this morning he tried to f–k me. I just couldn't let that happen. So I tried hang him. Please forgive me. I really feel bad, what I did." These notes were read into evidence at Petitioner's trial without objection.

At 6:45 p.m. on the same date of August 18, 1981, Petitioner was interviewed by Rick Ricards and Ed Forrest, members of the Nevada State Prison (NSP) Investigation Department. Petitioner was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He requested an attorney, but none was provided. The interview, however, continued and Petitioner made an incriminating statement. The defense successfully moved at the trial for the suppression of this statement.

Sometime subsequent to this interview Petitioner was moved from Unit 5 of the prison where he had been residing to "Max Unit," which was the maximum security housing unit of NSP. NSP is the maximum security prison for the State of Nevada. Within the Max Unit, Petitioner was placed in isolation (referred by some as "the hole"). There is no credible evidence that Petitioner sought to contact an attorney or the authorities or to make any telephone calls, after that time up until August 20, 1981, two days later.

Sometime just prior to 8:15 p.m. on August 20, 1981, Petitioner handed a note to correctional officer Stahl who was on duty in Max Unit. Stahl in turn handed this note to correctional officer Glen Blomgren who, as senior correctional officer on duty, was in charge of the unit. Blomgren who was stationed in the security office of the unit, examined the note. Blomgren cannot

recall verbatim the specific contents of the note, but he does remember that the note indicated Petitioner's great desire to see somebody in a "position of authority" to talk about why he was in the Max Unit. Blomgren also remembers that the note indicated an intimate knowledge of the murder weapon used, describing the material of which it was made and the way it was knotted. To Blomgren the note was "confessionary" and involved an inmate murder.[2]

Blomgren took the note and proceeded to Petitioner's cell with the intent to determine the "importance" of it. When he arrived at Petitioner's cell, Petitioner told Blomgren that the Johnson death was not a suicide. He asked Blomgren if the note would get attention.

Blomgren cannot recall the exact date of these occurrences regarding this particular note, but specifically confirms that the note was received around 8:15 p.m. The prison's daily log makes clear, however, that Petitioner's note requesting a meeting with the authorities was delivered to Stahl and Blomgren on August 20, 1981.

After the discussion with Petitioner about the note, Blomgren notified the Shift Commander for the prison, Lt. Francis Smith. Lt. Smith (in his own handwriting) documented the receipt of the note in the daily log for that shift of the watch at the prison (Exhibit F):

"8:15 P M Phone call complete in Max unit.[3] Also c/o Blomgren received a note from Inmate Neushafer (sic) which is being sent to investigations."

The preponderance of the evidence is that the note was then sent directly to the Investigation Division of the Prison and then on to the Carson City Sheriff's office, which (with the assistance of the Investigation Division) investigated major crimes at the prison at that time.

2. Officer Ricards of the Investigation Division of NSP recalls the note as saying that Petitioner "wished somebody to clear up his trouble." There is no credible evidence to support Petitioner's present contention that the note sought an attorney to represent Petitioner.

3. This statement referred to a telephone call that had been arranged for another inmate, Hartman, by the chaplain and Lt. Smith. Exhibit E also mentions this telephone call. Exhibit E is the log which records movement of inmates, visitations to the unit, doctors calls, officers on duty and unusual incidents for Max Unit for August 20, 1981.

Sometime after the note reached the Carson City Sheriff, officer Ricards of the Investigation Division arranged for an interview between Petitioner and Detective Michael Efford of the Sheriff's office. Ricards had been told that Petitioner wanted to talk to the police. Ricards told Efford Petitioner had asked to talk to Efford. Efford was not told that Petitioner had previously been interviewed and requested an attorney.

At approximately 2:30 p.m., on August 21, 1981, Petitioner was taken from Max Unit to another area in the prison for an interview with Efford, Ricards and Ed Forrest. At the interview Efford read Petitioner his Miranda rights. Petitioner indicated he understood his rights and did not request an attorney. (See Exhibit B.) He proceeded to give another incriminating statement. This statement was read into the record at trial over objection of defense counsel.

## INITIATION

■ The credible evidence is clear that it was Petitioner who initiated the further communication with the authorities after the August 18, 1981, interview in which he had requested an attorney. There is no credible evidence that the subsequent August 21, 1981, interview occurred for any reason other than Petitioner's request to speak to the authorities. He initiated the further communication with the authorities.

It may further be concluded that Petitioner heard a radio broadcast or some other kind of report sometime during August 19 or 20 which indicated that the authorities may have believed that Johnson's death was a suicide. Petitioner wanted to straighten that out for the authorities so that they would know it was a murder. Also, he was concerned that the wrong person might be charged for the crime. These things motivated Petitioner to want to explain to the authorities how the murder had occurred.

The transcript of the second interview on August 21, 1981, is further evidence that it was Petitioner who initiated the further contact with the authorities after the first interview where he had asked for an attorney. It may be inferred from Petitioner's explanations, in the course of the second interview, why he had asked to talk to the authorities, and that it was he who initiated the request for the further interview. The transcript of the second interview contains no indication that it was anyone other than Petitioner who initiated the request for the second interview.

While the note Petitioner sent to the authorities on August 20, 1981, has been inexplicably and inexcusably lost, there is strong credible evidence to support the conclusion that the note did request the interview with the law enforcement officials which was subsequently held on August 21, 1987.

## WAIVER

■ The credible evidence indicates that petitioner knowingly, voluntarily and intelligently waived his rights at the second hearing. Petitioner testified at his trial (outside the presence of the jury) that he understood he did not have to talk to Efford. In addition, petitioner stated that he remembered some of the specific Miranda warnings. Petitioner had requested an attorney at the first interview on August 18, 1981, but clearly did not request an attorney at the second interview on August 21, 1981. Petitioner was no stranger to the criminal justice system. He knew he could request an attorney at the interview on August 21, 1981, but he did not do so. In the totality of the circumstances it must be concluded that Petitioner voluntarily and intelligently waived his right to counsel at the interview on August 21, 1981.

These conclusions are supported by the fact that Petitioner's testimony at the evidentiary hearing on February 18, 1987, was not credible. The Court had the opportunity to observe Petitioner's demeanor and manner while testifying and has had the opportunity to consider the impeachment of his testimony by his inconsistent prior statements. The Court has also considered the content of Petitioner's testimony here and at previous hearings. On this and previous occasions it appears that rather than telling the truth Petitioner has fre-

quently given answers to crucial questions which were simply designed on the spur of the moment to be self serving according to the particular issue believed to be at hand. Petitioner has been impeached. His testimony as to the critical issues involved in this hearing is not to be believed.

The Court in reaching its decision has again reviewed the entire record, but has paid particular attention to the specific testimony and exhibits received at the evidentiary hearing.

The foregoing shall constitute findings of fact and conclusions of law.

This Court therefore finds and rules that:

(a) Petitioner initiated the interview of August 21, 1981, which led to his confession;

(b) Petitioner knowingly and intelligently waived his right to counsel, with respect to the interview and the confession which he gave on August 21, 1981.

These findings and this ruling, together with the entire record of the case (including but not limited to the transcript of the hearings of February 17 and 18, 1987, and the evidence adduced at the hearing of February 18) shall be transmitted forthwith by the Clerk to the Ninth Circuit Court of Appeals.